Mario Morano v. Commissioner.
Morano v. Commissioner
Docket No. 13810.
United States Tax Court
1948 Tax Ct. Memo LEXIS 149; 7 T.C.M. (CCH) 442; T.C.M. (RIA) 48125; June 29, 1948
*149 Thomas Cantillo, Esq., for the petitioner. John E. Mahoney, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner seeks a redetermination of deficiencies in income tax for 1943 and 1944 in the amounts of $17,103.04 and $12,118.18, respectively. Petitioner having conceded the correctness of respondent's disallowance of a deduction of $150 as legal expense for the taxable period 1942-1943, the remaining issues are concerned with the propriety of respondent's taxing to petitioner all of the income from an alleged family partnership; and the disallowance of travel and entertainment expenses. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner, an individual residing at Hillside, New Jersey, filed his Federal income tax returns for the taxable years in question with the collector of internal revenue for the fifth district of New Jersey. The Newark Screw Products, Inc. (hereinafter sometimes referred to as "the corporation") was incorporated under the laws of New Jersey on or about April 18, 1941, with a capitalization of 40 shares of common stock. At that time the outstanding *150 shares were held by petitioner, Joseph R. Liloia, and Frank Purro, each of whom held 10 shares. On April 30, 1941, 10 shares were issued to Edward L. Krebs for $1,000. Considerable friction arose between the stockholders and litigation ensued. About the middle of January, 1942, there were three stockholders, including petitioner, each of whom held 13 1/3 shares. By June, 1942, all the outstanding capital stock had been acquired by petitioner as follows: In April of 1942, with his individual funds, he acquired 13 1/3 additional shares, and on June 25 or 26, 1942, still another block of 13 1/3 shares for which he paid $3,000. About the time of the purchase of the stock in April, 1942, petitioner made a gift to his wife, Theresa, of 13 1/3 shares of the stock purchased. At about the time of the purchase of the stock in June, 1942, he made gifts of 6 1/2 shares each to Salvatore, his son, and Rosemarie, his daughter. The stock of the children was held by petitioner's wife as trustee. At that time petitioner and his wife each surrendered one-third share, and one qualifying share was held by Benedict Boronio. In September or October, 1942, the company's accountant, Alfred R. Marsh, *151 discussed with petitioner and his family the various angles of family partnerships compared with corporations, with particular reference to tax consequences and by the end of the year 1942, petitioner's advisers made a study of the tax posture of petitioner's business. After conferences with tax specialists, the assets of the corporation were liquidated, and the "partnership" agreement was entered into as hereinafter related. The question of taxation was one of the elements considered. On March 22, 1943, an agreement of "limited partnership" was executed by petitioner and his wife, Theresa, acting individually and as trustee for Salvatore and Rosemarie. The agreement denominated petitioner as the only general partner; Theresa, individually, and as trustee for the two children, comprised the three "limited partners." Under the terms of the agreement, after an annual salary allowance to petitioner of $5,200, and to Theresa of $1,200, the earnings were to be distributed 40 percent to petitioner, 20 percent to Theresa, 20 percent to Theresa as trustee for Salvatore, and 20 percent to Theresa as trustee for Rosemarie. By its terms the arrangement was to expire December 31, 1953, or *152 prior thereto upon mutual assent of the parties. The agreement recited: "Each limited partner shall contribute the amount set opposite their respective names, being a claim and interest in certain assets consisting of cash and fixed assets, whose value shall have been determined mutually by all partners, and evidenced by a bill of sale and assignment of the same to the partnership: Value of assets
"Limited Partner
contributed
"Theresa Morano
$5,000.00
"Theresa Morano, Trustee for
Sal Morano
2,500.00
"Theresa Morano, Trustee for
Rosemarie Morano
2,500.00
* * *
"That any losses suffered or debts incurred in and about the business of the Partnership shall be borne by all the partners in the same proportion in which they are entitled to share in the profits of the Partnership, but all the Limited Partners shall not in any event be liable for any loss or debt whatsoever in excess of the capital contributed by them and their respective shares of the profits. * * *
"Each of the parties hereto shall devote their time, attention, skill and best efforts to the business." In order to effectuate the arrangement, the assets of the corporation were *153 liquidated, and upon surrender and cancellation of 36 shares of its stock its physical assets were transferred to the stockholders in an ascertained value as follows: Petitioner
$3,435.90
Theresa
3,435.90
Theresa, as trustee
for Salvatore
1,707.96
Theresa, as trustee
for Rosemarie
1,707.95
Each of the stockholders reported their capital gain on their respective tax returns, and the Bureau of Internal Revenue was advised of the liquidation. The corporation continued in existence and on December 30, 1943, acquired land and a building with the intent of establishing a factory. Capital was a material factor in the production of the income of the business. The parties left a substantial part of their income in the business in order to expand and improve its financial condition. Salvatore was born February 13, 1926, and Rosemarie was born November 11, 1927; at the time of the gifts of stock Salvatore and Rosemarie were 16 and 14 years of age, respectively, and on the execution of the agreement of "limited partnership" they were 17 and 15 years of age, respectively. During the taxable years 1943 and 1944, Theresa, Salvatore, and Rosemarie did some work in *154 the business. Salvatore and Rosemarie worked after school and during summer vacations; Salvatore did not return to school after June, 1944. Petitioner exercised full power in hiring and firing employees in the factory and in the purchase of raw materials. He was a good shop man but without business experience or outside contacts. He was not an aggressive salesman. Both the corporation and the company had an outside man to represent them. During the tax years all of the members of the family were interested in reports by their accountant, and asked questions concerning them. The conferences took place during the day and in the evenings. Theresa did work at the office and at home. She signed some checks and during the period between April, 1942, and March, 1943, she was present at the company's office at times. After April, 1942, she qualified as a director of the corporation and was appointed its secretary. Her instructions sometimes came from her husband and sometimes from Joseph Volpe, the general foreman. She did not perform any of the operations in the plant but did perform mechanical operations at home where the cellar was fixed up with a work bench, equipment, and two small *155 drill presses. Theresa used it as an inspection bench and also worked with various testing tools to determine the value of the product. The mechanical work performed by Theresa, compared with the other workers in the factory, was very good as to quality and amount of production. Theresa discussed with petitioner questions relating to the acquisition of new machinery, and quite frequently differed with her husband. In 1943 the whole family participated in a discussion relating to the acquisition of $25,000 worth of additional automatic machines. Salvatore went to the machine dealers along with Marsh who was assisting in the business. Marsh attended to matters of priorities and War Production Board allocations. He took care of the personal income tax returns for the members of the family. He was instrumental in bringing experts in to help smooth out production problems. During 1943 and 1944 Marsh advised against the employment of Rosemarie in the factory due to the lack of toilet facilities. It was thought more desirable to have her work at the inspection bench in the basement at home. Rosemarie did, however, work at the office, filing and billing. During vacation she came to the office *156 four or five days a week. Salvatore acted as expediter and assistant to his father, helping him express himself in English. He carried blueprints and materials, expedited deliveries, and worked on any of the machines to take the place of a workman who did not show up. The work on the machines was the type work done by a skilled mechanic. He had had instructions in the operation of the grinder. After he quit school in June, 1944, he devoted his full time to the business, sometimes working at home. Petitioner's work was primarily setting up the jobs. Theresa helped him in arriving at estimates for jobs. Sometimes, in order to get a job under competitive bidding Theresa undertook to do some of the work, and this sometimes enabled them to submit a successful bid. The employment of the children was similarly advantageous. During the year ended March 31, 1942, the corporation paid Theresa $1,500, and Salvatore, for the third quarter of the year, $238.92, as compensation for services rendered. For the year ended March 31, 1943, the corporation paid as compensation $4,400 to petitioner, $1,500 to Theresa, and $42.01 to Salvatore. The payroll books of the business record no payments *157 to Salvatore in 1943 and $495 in 1944 as compensation; and they record that Rosemarie was paid $100 in 1943 and $1,300 in 1944 as compensation, and that the account of Theresa was credited with $900 in 1943 and $1,200 in 1944 as compensation for services rendered. No record was kept of the hours worked by Theresa, Rosemarie or Salvatore during the taxable years. The March 22, 1943, agreement of "limited partnership" did not create a partnership within the meaning of the Internal Revenue laws. Opinion This is a family partnership case in which petitioner claims validity of the arrangement for tax purposes on the grounds that his wife and children contributed services and capital originating with them. ; . Petitioner would have us accredit his family with a contribution to the partnership of capital originating with them, by reason of the transfer of assets derivative from a liquidation of stock in the same business when conducted for a brief period in corporate form. That stock had been transferred to the members of his family by petitioner, and in this respect the case is similar *158 to the situation in , where the Supreme Court noted that the transfer of the stock was conditioned upon the wife's contributing the derivative assets to the partnership. We cannot say that the transitory space of a few months during which the corporate stock stood in the names of petitioner's wife and children is sufficient to distinguish the two situations. And the fact that the capital contribution of petitioner's wife would have to be traced through her holding of stock of the predecessor corporation to which she had rendered some services, does not call for a different conclusion. In a case which petitioner describes as "almost identical" we held that the family partnership lacked reality for tax purposes where the wife's interest in the predecessor corporation was obtained by a gift from the husband and on account of uncompensated services, and the children were included by gifts from both parents. . Certainly the element of effective and independent ownership and control is as lacking here as it was there. "There is no evidence that the purported donees ever exercised their voting rights on *159 the stock. No dividends were paid, although the business was growing rapidly. We deem significant also the manner in which Mrs. * * * [Morano's] 'gifts' parelleled those of her husband. Her 'gifts' were complementary to those of the petitioner and were designed to equalize the holdings of each member of the family. The conclusion we are compelled to draw from this is that Mrs. * * * [Morano] never had an unfettered domain over the shares purportedly given to her, but was completely amenable to the petitioner's wishes in the matter of their disposition. The petitioner was president and general manager of the corporation prior to the time of the alleged gifts. There is nothing in the record to indicate that this control of the corporation was any the less after they had been made." (page 1102.) It is true that upon petition for review the Circuit Court of Appeals drew different inferences of fact from the record and reversed our decision. (C.C.A., 6th Cir.), . With the greatest deference, however, we are constrained to regard the earlier decision as correct and to continue to follow it. After a careful consideration of the record, we further conclude *160 that there was not such participation by the wife or children in the management of the business or performance of vital additional services as would justify a recognition for tax purposes of their status as partners. Even the legal agreement entered into by the parties cast the relationship in the form of a limited partnership in which petitioner was the only general partner. We do not perceive in this respect that the activities of the wife and children extended beyond those of minor employees or their natural duties as spouse and child, or that any "changes of a material nature were wrought by the [new] agreement." . The salary payments provided for the family and allowed as deductions by respondent amply disposed of the value of any services rendered. See . On the entire record we cannot conclude that this family "really and truly intended to join" together as a partnership. , (June 21, 1948). On the other issues the evidence is scant, petitioner requests no findings of fact *161 relating to them and does not urge them in his briefs. Even if the issue has not been abandoned, the evidence is inadequate to justify essential findings. This is not like , in that here respondent disallowed only a part of the deductions claimed. Assuming that expenditures of a deductible nature were incurred, there are no figures nor even estimates from which we can conclude that they exceeded the amounts which respondent has approved. We cannot find that the respondent erred on these issues. Decision will be entered for the respondent.